ROANE, Judge.
The weight of testimony in this cause being in favor of the appellee, independently of the testimony of Anthony Thornton, it is unnecessary to decide how far his deposition is admissible, or not, in consequence of its having been taken before a person who is alleged to have been no Magistrate. I shall barely remark, however, that this case differs from that of Blincoe v. Berkley, 1 Call, 405, in that, here a commission was regularly awarded by the Court; the parties attended in pursuance, and as no objection was taken to the deposition at the time, it shall either be intended that Anthony Thornton, jun. was then a Magistrate, or that the parties agreed that the deposition might be taken before him. The certificate *337 that that gentleman was not recommended to the Governor until a posterior time, is not conclusive evidence that he was not a Magistrate before; as it was, in so o instances probably the practice, to commission persons who had not been recommended.
I throw this out, however, only as my present impression. The testimony of Mrs. S', and T. S. go directly to establish a marriage agreement on the part of old Colonel Robinson. This was a most interesting fact for the family, and one which would have made an indelible impression. It is only confronted by the belief of Mr. Pendleton, that Mr. Benjamin Robinson’s first knowledge of his title was derived from him, in or about the year, 1755; but as he does not speak from his memoranda at the time, it is probable he may be mistaken as to the year; and even if not, the pleasure discovered by old Mr. Robinson on the information received from him, may have arisen from his great reliance on the judgment and professional skill of that gentleman, and, consequently, may not be inconsistent with a knowledge on this subject previously derived from other sources. Admitting, then, this testimony to be as respectable as any whatever, yet it is overbalanced by that of the two witnesses before named; and their testimony is confirmed by that of Barnes.
Great stress was laid by Mr. Randolph, on the deed of 10th March, 1757, for the Orange land, (by B. R. jun.) which he supposes contains a recognition of the deed of the 10th February, 1757; but it only admits the fact, that Benjamin the father had before conveyed to him the Caroline land. This was probably from verbal information, as the deed of February, 1757, was probably then in the Caroline office. It is certainly, however, by no means inferrible from the deed of March 10, that that of Februa,ry had ever been seen by him; far less that, he was a party to it; and, if that deed varies from the terms of the marriage promise, it was not obligatory on him.
Mr. Randolph contended, that the marriage promise was void against purchasers under the act of Assembly, Admitting, (which cannot be denied,) that parol marriage agreements were then valid, according to this doctrine the promiser would have nothing to do but refuse to execute the deed, and then convey the land, which would defeat the promise. The admission, therefore, is inconsistent with the conclusion he draws. The intention of the act was certainly not of this kind; it was to compel persons. *338 wlio had written contracts or agreements, to record them for the information of others within a reasonable time.
I am, therefore, of opinion, that the case is a plain one, and that the decree of the Chancellor ought to be affirmed.
FLEMING, Judge.
The first' question made at the bar, was, whether the marriage contract was established? And I am of opinion that it is. Thornton’s deposition, which clearly proves it, is objected to, as having been illegally taken; but, besides that, if it wore necessary to investigate the point, it would perhaps turn out that the. objection is not well founded; there is ample testimony to support the contract.: For, the depositions of the two S’s are full to that effect; they state (he circumstances with such precision as to leave no doubt upon the mind: and they contain nothing which is inconsistent with that of Mr. F., who like them, speaks merely from memory, and may have been mistaken as to dates.
It is said, however, that even if the contract were proved, yet still it was destroyed by the deeds of September, 1753, and March, 1757: because, the first merged the parol contract, and the latter recognized the right of Joseph. But, I am of a different opinion: For, the object of that of September, was only to secure the Orange land to Benjamin the son, in case the moiety of Page’s was not recovered; but as soon as that should be recovered, it was to be conveyed, and the other restored. Therefore, so far from this deed merging, it rather affirmed the marriage contract: And, with respect to that of March, it does not appear that Benjamin the son, if he meant to refer to the trust deed, had ever seen it or knew what it contained: for, he states it to be for 500 acres, without any restriction, although it gave him only 459 acres after the death of his father and mother, with a moiety instead of the whole of the mill; and even these were to be held in tail, instead of fee simple. Hence, it is plain, that if he did mean to refer to that deed, he was a stranger to its contents, and was deceived as to the purport of it: Which mistake, the father, never removed, but, on the. contrary, is said by one of the witnesses to have been in the habit, long after-wards, of speaking of the whole mill as belonging to Benjamin the younger, after his own death. Of course, no inference can be drawn from this supposed recognition.
But, then it is urged that the marriage contract, not having been recorded within the eight months, is void *339 against purchasers by the act of Assembly. Old Edit. Eaws, 143. The purchasers meant in that act, however, are those for valuable consideration, and not mere volunteers. Of course, the argument does not apply to the present case. But, to remove this difficulty, it was said that the gift to Joseph was a provision for a younger sou, and that this was a good consideration. The observation at first sight, is plausible; but there is no force in it. For, besides that, Joseph was, in fact, the eldest and not the younger son, it appears by his deed of trust to the appellant, that his father had devised to him the Moon?s-mount estate, containing 1,100 acres, which was probably a better provision than that made for his brother Benjamin.
There are other circumstances which have some weight; for, it seems that Joseph abandoning his claim under the deed of trust, relied upon the will to support, his right; that after Benjamin the grandson, sold to Corbin, he gave him possession in the presence of Joseph, and that the latter even turned his own miller out of the mill, and suffered Corbin to remain in quiet possession for several years, before he executed the deed to the plaintiff. This shews his own conviction on the subject, and serves to strength-oil his brother’s title.
Upon the whole, I think the decree of the High Court of Chancery is right, and ought to bo affirmed.
CARRINGTON, Judge.
Concurred, that the decree of the High Court of Chancery should be affirmed.